# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Appeal of: East Mount Airy Neighbors : 
and Susan Oh : 
: No. 620 C.D. 2023
From a Decision of: Zoning Board of : 
Adjustment : Submitted: November 7, 2024


BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE MATTHEW S. WOLF, Judge
HONORABLE MARY HANNAH LEAVITT, Senior Judge


## OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE WOLF                                           FILED:  September 16, 2025

East Mount Airy Neighbors (EMAN), a registered civic organization, and Susan Oh (collectively, Objectors) appeal from the May 8, 2023 order of the Court of Common Pleas of Philadelphia County (trial court).  The trial court's order affirmed a decision of the Zoning Board of Adjustment of the City of Philadelphia (Board) that granted CDPHI LLC's (Applicant) application for dimensional variances.  Upon review, we affirm the trial court's order to the extent it affirmed the Board's decision that Applicant established unnecessary hardship and that the grant of dimensional variances would not adversely impact the public under Section 14-303(8)(e)(.1) of the Philadelphia Zoning Code (Zoning Code).  We vacate and remand to the trial court for further proceedings regarding whether Applicant established that the dimensional variances are the minimum necessary for the proposed development to be a viable project.

**Background**

In 2020, Applicant filed an application for a zoning/use permit with the Philadelphia Department of Licenses and Inspections (L&I), seeking to relocate lot lines on three parcels situated at 109 Pleasant Street, 121 Pleasant Street, and 106 Meehan Avenue to create nine lots. Reproduced Record (R.R.) 133a. An aerial view of the parcels is as follows:



*Id.* at 152a.

Applicant's proposed development sought to completely demolish the existing building at 121 Pleasant Street and to erect a single-family home on each of the nine new lots, complete with a roof deck, roof deck access structure, and one accessory surface parking area accessed from Meehan Avenue via a shared driveway. *Id.* Eight of the lots would front Pleasant Street and the ninth lot would front Meehan Avenue. *Id.* On July 22, 2020, L&I issued a total of 10 refusal notices.

*Id.* Therein, L&I concluded that the eight lots fronting Pleasant Street did not meet the minimum 1,440-square-foot lot area requirement for Philadelphia's RSA-5 Zoning District, and that the lot fronting Meehan Avenue did not meet the minimum rear yard depth and minimum side yard width requirements for the same. *Id.* Applicant appealed L&I's refusals to the Board.

On appeal, Applicant asserted that literal compliance with the Zoning Code created an unnecessary hardship due to the size, shape, contours, and physical dimensions of the parcels. The Board held an initial hearing on October 21, 2020. At the initial hearing, Applicant's counsel argued that two of the refusals for the minimum rear yard depth and minimum side yard depth for Meehan Avenue were issued in error. R.R. 9a-12a. Counsel also described Applicant's goal for the project and explained that building by-right would result in six large homes that do not fit with the character of the surrounding area, while building nine smaller single-family homes would be consistent with the existing structures in the neighborhood and would allow the homes to be marketed and sold at more affordable price points. *Id.* at 17a-18a. Applicant also offered the testimony of Scott Woodruff, project architect, who adopted Counsel's testimony, and further explained that Applicant's goal for the project was to develop single-family homes with accessory parking that fit within the character of the already established neighborhood. *Id.* at 14a. The Board also heard testimony from members of the public in opposition to Applicant's proposal. *Id.* at 26a-59a. The public opined that Applicant's only hardship was economic, and voiced concerns about traffic, the proposed shared driveway fronting Meehan Avenue, the potential for increased flooding, and the loss of tree canopy and green space. *Id.* Finally, the Board heard from member of Applicant, Doug Bomar,

3

who explained the idea behind the proposed subdivision of the three existing parcels. He stated:

> The idea was pretty simple. I mean, we looked at the block and saw two huge lots and didn't seem contextual at all. It didn't seem like something that was appropriate and we wanted to build something that was appropriate and something not only that was appropriate in design, which is really our -- where we start, but appropriate in price point, too. So if we -- if we looked at them as a price option here . . . . [i]t'd be over 4,000[-]square[-]foot houses, which is not at all what's going on on the block, and it's just not something we thought made any sense. And it didn't -- I don't think, again, made any sense from a design point of view or an economic point of view.

*Id.* at 69a. Mr. Bomar testified that he has had several conversations with EMAN and other community members in an attempt to understand and assuage their concerns related to the proposed development. *Id.* at 71a. The Board ultimately continued the case to allow Applicant and community members additional time to discuss the project. *Id.* at 73a.

Following the initial hearing, the existing structure at 121 Pleasant Street was nominated for historical designation. *Id.* at 432a. Applicant did not oppose the nomination, and the Philadelphia Historical Commission designated 121 Pleasant Street as historic in February 2021. *Id.* As Applicant's initial plan included demolition of the 121 Pleasant Street structure, Applicant sought leave from the Board to present a revised plan to L&I. Through a letter dated April 26, 2021, Applicant explained that the following changes were made to the proposal as a result of the historical designation of 121 Pleasant Street and extensive discussions with EMAN: (1) preservation of the existing structure at 121 Pleasant Street; (2) reorientation of lot lines to propose eight new lots, with six new construction single-

4

family homes fronting Pleasant Street and two new construction single-family homes fronting Meehan Avenue; (3) relocation of the shared driveway to be accessed from Pleasant Street instead of Meehan Avenue; (4) change in front setbacks and rear yards for lots fronting Pleasant Street; and (5) reduced height of the homes from 35 ½ feet to 34 ½ feet.

L&I issued amended refusals on the basis that (1) all eight lots did not meet the minimum 1,440-square-foot lot area requirement;[1] (2) the two lots fronting Meehan Avenue did not contain sufficient minimum lot width;[2] (3) the six lots fronting Pleasant Street did not meet the front setback requirements; and (4) the 121 Pleasant Street structure lacked the required five-foot side yard. The Board held a second hearing on the amended refusals on April 13, 2022.

At the second hearing, Applicant's counsel explained the revisions to the proposal following the historical designation and consideration of community feedback. Counsel stated that as revised, Applicant intends to construct eight new single-family homes along Pleasant Street and Meehan Avenue. R.R. 89a. Six of the homes would front Pleasant Street, two would front Meehan Avenue, and the existing historical structure would be retained. *Id.* Counsel also explained that the revised plan moved the access point for the shared driveway from Meehan Avenue to Pleasant Street. *Id.* Regarding L&I's amended refusals, Applicant's counsel discussed each in turn. Beginning with the lot width of the two Meehan Street parcels, counsel stated that the Code requires sixteen feet, and the proposed widths are between 13 and 14 feet, which is "actually in line with the homes that front

---

[1] The proposed undersized lots ranged from 1,130 to 1,208 square feet, below the 1,440 square feet required by the Zoning Code for lots in the RSA-5 Zoning District.

[2] The proposed lots widths were 13.4 and 14.7 feet, respectively; below the 16 feet required by the Zoning Code for lots in the RSA-5 Zoning District.

5

Meehan that are all between 13 and 15 feet wide in this RSA-5 section[.]" *Id.* at 90a.

Regarding minimum lot area, Counsel stated that the proposed homes range "between a low of 1,130 and 1,208 square feet," which is below the 1,440-foot threshold, but is "right in line with all of the lot sizes in this area." *Id.* at 90a. More specifically, Counsel testified that

> all of the [surrounding lots sizes] range, you know, 1,236, 1,028, 1,253. These two on the corner are a bit larger. These are really smaller at 700, and the ones across Pleasant Street are actually all smaller lots. So what we're looking to do is well within the range of the surrounding community and we're seeking the same treatment as all of the other homes in the neighborhood.

*Id.* at 93a. Counsel stated that Applicant worked closely with the community and neighbors for two and a half years to revise the proposal in order for the development to be contextual with the neighborhood. *Id.* at 90a. In addition to the lot lines, those changes to the plan included reducing the height of the new buildings to 34 ½ feet, retaining the historic building at 121 Pleasant Street, and the following:

> All the houses on Pleasant were moved back three feet, adding grass. We added street trees, covered entries, reduced the height, added detailed cornice, lightened the metal roofing color. Every aesthetic or design detail that was raised by [EMAN], we addressed. We changed the brick facade and the mansard roof to wrap around the front to the drive aisle, adjusted where the drive aisle was located, and did significant planting as well in adding street trees.

*Id.* at 94a. Addressing density, counsel explained that:

> [F]rom a density standpoint, from a lot width, lot area standpoint, this is squarely in line with the surrounding

6

buildings, and this would take what is essentially a large vacant, unused lot of land and add some homes which will improve security, and additional funds to the city in the form of taxes, and really will be a benefit to the community.

*Id.* at 95a.

Mr. Bomar testified next and adopted Counsel's testimony in full. He also explained that over the past two and a half years, Applicant has participated in multiple meetings with EMAN, the Board, and the Philadelphia Historical Commission, and at each step has considered feedback and made changes based on that feedback. R.R. 96a. As to the project's economics, Mr. Bomar stated that Applicant could not reduce the density of the project and still maintain financial viability. Specifically, he stated:

> If we reduced the unit count, it wouldn't be a viable project, and we don't think it would be a contextual project at that point, either. If the houses, instead of being 24 or 25 hundred square feet, were, you know, 35 hundred square feet, we just don't think that would be contextual in terms of size and we don't think it would be contextual in terms of what we would need to, you know, what the market price would have to be in order for it to seek financial viability, you know. I don't think we would get there.

*Id.* at 98a.

The Board also heard from various community members who oppose the proposal as revised. Charles Richardson, on behalf of Councilwoman Bass, noted that the Councilwoman opposed the project in accordance with near neighbors. R.R. 99a. Nina Curtlett, on behalf of EMAN, stated concerns with potential changes to the historical home, the density of the project, and the lack of hardship that would necessitate building the project as revised. *Id.* at 102a. Next, Susan Oh testified that

7

she lives at 108 Meehan Avenue and opined that Applicant could not show a hardship and was not entitled to the requested dimensional variances. *Id.* at 103a-04a. Ms. Oh also stated concerns regarding increased density as a result of the project, and the dangers associated with construction accidents. *Id.* at 104a. Specific to her home, she noted foundation issues and her concern that nearby ground upheaval could agitate the issue. *Id.* at 105a. She also noted that she has three young children, and the "risk[-]to[-]reward ratio cannot be justified and should neither be deemed as necessary to this project." *Id.* Finally, Ms. Oh articulated her concerns from an environmental standpoint, noting the loss of green space and mature trees in the name of development. *Id.* at 106a. On cross-examination, Ms. Oh admitted that she has offered to buy the lot at 106 Meehan Avenue several times and that she has previously used the empty lot to plant sunflowers and hold community gatherings. *Id.* at 107a-08a.

Althea Banks, who lives directly across the street from the project on Meehan Avenue, expressed her thanks that Applicant moved the driveway to front Pleasant Street, but expressed her desire that Applicant construct one house on Meehan Avenue instead of two. R.R. 109a. David Fecteau of the Philadelphia Planning Commission (Planning Commission) testified next. He stated that although he does not believe a hardship exists that would prevent by-right development, he acknowledged that the average lot size on this block of Pleasant Street is approximately 1,000 feet, so the proposed lot sizes match the character of the neighborhood. *Id.* at 109a-10a. For this reason, Mr. Fecteau testified that the Planning Commission recommends that the Board grant the dimensional variances. *Id.* at 110a.

**Zoning Board Decision**

On April 20, 2022, the Board issued a unanimous decision granting Applicant's request for dimensional variances under Section 14-303(8)(.1) of the Zoning Code. Therein, the Board concluded that "Applicant has met its burden of production and persuasion with credible evidence and testimony of a hardship that supports the granting of the requested dimensional variances." Board Decision at 15, Conclusion of Law No. 10. Specifically, the Board made the following relevant conclusions:

> 11. During both hearings, the Applicant presented evidence that constructing homes based on the required lot size for the RSA-5 zoning district would result in an economic detriment to the applicant and be inconsistent with the characteristics of the surrounding community.
>
> 12. Specifically, the Applicant showed that the average lot size for the area was significantly below the required 1,440[-]square[-]foot threshold in the Zoning Code. This was further acknowledged by Mr. Fecteau of the Planning Commission, who noted that the average lot size for the 100 block of Pleasant Street was approximately 1,000 square feet. In fact, the proposed lot sizes containing the eight new construction homes are all greater than the 1,000[-]square[-]foot average. 4/13/22 N.T. at 6, 9, 25, 26.
>
> 13. Moreover, the Board found persuasive Mr. Bomar's testimony that requiring the Applicant to build fewer homes on larger lots would make the project financially unfeasible, as the larger homes necessary to make the project viable may not sell. Larger homes on bigger lots would also be out of character with neighborhood, a contention that the Applicant sufficiently supported through photos and a comparison of existing lot sizes on Pleasant Street. *Id*. at 9, 14; Applicant's 4/13/22 Exhibit Packet at 21-24.

14. The Applicant made a similar argument regarding the lot width refusals for the Meehan Street lots and presented persuasive testimony that demonstrated that the proposed lot widths were consistent with the remainder of the block. The Board also found that the requested variances for the lot width were de minimis, merely 2.6 and 1.3 feet less, respectively, than the required 16 feet. 4/13/22 N.T. at 6, 8; Notice of Refusal dated 11/3/21.

15. In addition, the Board found that the Applicant demonstrated that its proposal represents the least minimum variances necessary to afford relief based on the proven hardship. Mr. Bomar specifically stated in his testimony that with the rehabilitation of the historic structure, this project would not be financially viable without the eight new-construction units. 4/13/22 N.T. at 14.

16. The testimony and evidence previously discussed showing that the proposed lot sizes and lot widths were comparable with the surrounding neighborhood also supported the Applicant's argument that the requested variances were the least minimum. Even smaller lots than proposed would have been contextual with the neighborhood. However, the Applicant presented larger-than-average lot sizes and approximately 3 additional units (one on Meehan and two on Pleasant) than what would permitted by-right based on a 1,440[-]square[-]foot lot size.

17. Furthermore, the Board took notice that the proposed single-family use as well as the other dimensional aspects of the project conformed to the requirements of the property's RSA-5 residential zoning.

18. Finally, the Board found that the Applicant credibly and persuasively met the other criteria under §14-303 (8)(.1)(.a)-(.h) in the Zoning Code for the requested dimensional variances.

*Id.* at 15-16, Conclusions of Law Nos. 11-18.

**Trial Court Opinion & Order**

Objectors appealed the Board's decision to the trial court, which affirmed. In so doing, the trial court rejected Objectors' argument that the Board relied exclusively on economic factors in granting Applicant's variance request. It noted that contrary to Objectors' contention, the Board specifically identified both noneconomic and economic factors that created the hardship, namely that construction by-right was proven to be out of character with the surrounding neighborhood. The trial court likewise rejected Objectors' argument that Applicant failed to establish the minimum variance requirement. It noted that the Board credited Applicant's testimony and evidence that the project was not economically feasible with less than eight new homes, especially in light of the historic designation of 121 Pleasant Street and the retention of that historic structure. Finally, the trial court rejected Objectors' third argument that the Board's grant of the dimensional variances adversely impacts the public. The trial court explained that the Board addressed each of the public safety and environmental concerns and concluded that there were ample facts of record to show that the public would not be adversely affected. The trial court highlighted the change of the location of the shared driveway from Meehan Avenue to Pleasant Street in an effort to increase traffic safety, the increase in trees and landscaping to each new parcel to address the environmental concerns, and the use of pervious pavers to reduce potential water run-off and flooding. Objectors appealed the trial court's order to this Court.[3]

---

[3] In cases where the trial court does not take additional evidence, this Court reviews the decision of the zoning board. *Dowds v. Zoning Bd. of Adjustment*, 242 A.3d 683, 692 n.10 (Pa. Cmwlth. 2020) (citation omitted). We evaluate whether the zoning board committed an error of law, whether it violated the appellant's constitutional rights, whether it violated its practice and procedure, or whether its findings of fact were supported by substantial evidence. *See* 2 Pa. C.S. § 754. Substantial evidence is defined as relevant evidence that a reasonable mind might accept as
**(Footnote continued on next page…)**

11

**Appeal**

Objectors raise various issues on appeal to this Court, which we combine and reorder for ease of discussion. First, they maintain that the Board erred in finding that Applicant established that the denial of the variance would result in unnecessary hardship. They submit that such conclusion lacks a legal basis and is not supported by substantial evidence of record. Second, Objectors argue that the Board's conclusion that the dimensional variance will not adversely impact the public is not supported by substantial evidence. Third and finally, Objectors assert that the Board improperly concluded that Applicant met its burden of proving that the requested dimensional variances constitute the minimum variances necessary to afford relief.

**Analysis**

We begin with the applicable zoning provisions. The Zoning Code provides that the Board shall grant a variance if it finds each of the following criteria satisfied:

> (.a) The denial of the variance would result in an unnecessary hardship. The applicant shall demonstrate that the unnecessary hardship was not created by the applicant and that the criteria set forth in § 14-303(8)(e)(.2) (Use Variances) below, in the case of use variances, or the criteria set forth in § 14-303(8)(e)(.3) (Dimensional Variances) below, in the case of dimensional variances, have been satisfied;

---

adequate to support a conclusion. *Pequea Twp. v. Zoning Hearing Bd. of Pequea Twp.*, 180 A.3d 500, 504 (Pa. Cmwlth. 2018). If the record contains substantial evidence, this Court is bound by the Board's findings that result from the resolution of credibility and conflicting testimony. *Pohlig Builders, LLC v. Zoning Hearing Bd. of Schuylkill Twp.*, 25 A.3d 1260, 1266 (Pa. Cmwlth. 2011). On questions of law, "our standard of review is de novo and our scope of review is plenary." *Gorsline v. Bd. of Supervisors of Fairfield Twp.*, 186 A.3d 375, 385 (Pa. 2018).

(.b)    The variance, whether use or dimensional, if authorized will represent the minimum variance that will afford relief and will represent the least modification possible of the use or dimensional regulation in issue;

(.c)    The grant of the variance will be in harmony with the purpose and spirit of this Zoning Code;

(.d)    The grant of the variance will not substantially increase congestion in the public streets, increase the danger of fire, or otherwise endanger the public health, safety, or general welfare;

(.e)    The variance will not substantially or permanently injure the appropriate use of adjacent conforming property or impair an adequate supply of light and air to adjacent conforming property;

(.f)    The grant of the variance will not adversely affect transportation or unduly burden water, sewer, school, park, or other public facilities;

(.g)    The grant of the variance will not adversely and substantially affect the implementation of any adopted plan for the area where the property is located; and

(.h)    The grant of the variance will not create any significant environmental damage, pollution, erosion, or siltation, and will not significantly increase the danger of flooding either during or after construction, and the applicant will take measures to minimize environmental damage during any construction.

Zoning Code § 14-303(8)(e)(.1)(.a)-(.h).  For dimensional variances, as sought here, the Zoning Code provides additional guidance on what constitutes an unnecessary hardship.  It explains:

To find an unnecessary hardship in the case of a dimensional variance, the Zoning Board may consider the economic detriment to the applicant if the variance is denied, the financial burden created by any work

13

necessary to bring the building into strict compliance with the zoning requirements and the characteristics of the surrounding neighborhood.

Zoning Code § 14-303(8)(e)(.3). It is well settled that an applicant for a variance bears the burden of proof as to each requirement of the zoning ordinance. *Metal Green Inc. v. City of Phila*, 266 A.3d 495, 506 (Pa. 2021). Unlike a use variance, because a dimensional variance seeks only an adjustment to the zoning regulations, the quantum of proof needed to establish unnecessary hardship is reduced. *Hertzberg v. Zoning Bd. of Adjustment of the City of Pittsburgh*, 721 A.2d 43, 47-48 (Pa. 1998). A dimensional variance may be granted upon evidence that bringing the property "into strict compliance with the zoning requirements" would cause a financial hardship." *Id.* With these principles in mind, we turn to Objectors arguments on appeal.

## I. Unnecessary Hardship[4]

First, Objectors assert that there was neither a valid legal basis nor substantial evidence for the Board's conclusion that Applicant met its burden of proving an unnecessary hardship not created by Applicant. Objectors argue that Pennsylvania courts have consistently rejected requests for dimensional variances

---

[4] Throughout their brief, Objectors assert that the Board erred in failing to apply the terms of the new "Eighth District Overlay District," which was added to the Zoning Code on April 28, 2021 (Eighth District Overlay Amendment). *See* Objectors' Br. at 42 n.3. Objectors argue this new provision applies to the instant matter because it was passed before Applicant amended its zoning application following the historical designation of 121 Pleasant Street and other revisions to the plan. The trial court concluded that the Board properly analyzed Applicant's variance requests without consideration of the Eighth District Overlay Amendment because it was enacted after Applicant's initial zoning application in 2020, which is the controlling date for what legislation applies. We agree that the Board properly considered the zoning provisions in effect as of the date of Applicant's initial application and therefore do not further address Objectors' arguments regarding the Eighth District Overlay Amendment. *See Dowds v. Zoning Bd. of Adjustment*, 165 A.3d 75 (Pa. Cmwlth. 2017) (subsequent changes to plans submitted after the initial filing date do not result in a new application filing date under the pending ordinance doctrine).

14

where the asserted hardship amounts merely to a developer's desire to increase a project's profitability. *See* Objectors' Brief at 30-33 (collecting cases). Additionally, they maintain that a hardship arising from the subdivision of conforming lots into nonconforming lots is *per se* self-inflicted harm and can never justify a variance. *Id.* at 33-38. In support, Objectors specifically rely on *Volpe Appeal*, 121 A.2d 97 (Pa. 1956) and *Carman v. Zoning Board of Adjustment*, 638 A.2d 365 (Pa. Cmwlth. 1994).

In *Volpe*, a landowner purchased two lots totaling 32,500 square feet in a residential zoning district. Pursuant to the applicable ordinance, the minimum lot area for such residential zoning district was 20,000 square feet. After landowner constructed a dwelling on a portion of the lots, he conveyed 21,130 square feet to another, leaving him with an ownership interest in a parcel totaling 12,448 square feet. After that conveyance, landowner requested a variance in order to construct a stone dwelling on the remaining parcel. The zoning board and the trial court concluded that under the facts, landowner had not proved unnecessary hardship entitling him to a variance. On further appeal, the Pennsylvania Supreme Court affirmed, holding

> if there was any unnecessary hardship, [landowner] himself created it with full knowledge of the restrictions in the zoning ordinance. If we were to hold that this [landowner] suffered unnecessary hardship, every other property owner in the area classified 'AA' residential, would similarly be entitled to build his home on a lot of 12,000 square feet, which of course would nullify the ordinance. A board of adjustment has no power or right to set at naught a zoning statute or ordinance under the guise of a variance. *Lukens v. Ridley Township Zoning* [*Bd.*], 80 A.2d 765[ (Pa. 1951)]; *Devereux Found*[.]*, Inc. Zoning Case*, 41 A.2d 744[ (Pa. 1945)].

15

*Volpe*, 121 A.2d at 100.

Objectors also rely on *Carman*, where a developer was granted permits to subdivide and construct 20 single-family homes in the form of detached and semi-detached structures. There was confusion regarding Lot #1, and ultimately Developer's permit to build a semi-detached structure thereon was revoked. Developer appealed the revocation, arguing he had a vested right in the previously-issued permit, which this Court rejected. Alternatively, Developer argued that he was entitled to a dimensional variance to construct a semi-detached home on Lot #1. He submitted that the hardship was not self-inflicted because both Developer and the department that issued the permit believed the subdivision was planned as a matter of right. This Court rejected Developer's request for variance, citing *Volpe* and explaining that "it is well established that the law does not permit a developer to subdivide its land and then make a subsequent claim for a variance because a remnant of that land does not conform with a zoning ordinance." *Carman*, 638 A.2d at 369.

Here, Objectors argue that it was admitted throughout the hearings that the parcels could be developed by-right, yet Applicant merely desires to subdivide three conforming lots into nonconforming lots in order to maximize profits. Additionally, Objectors submit that *Volpe* and *Carman* establish that Applicant may not subdivide the parcels and then claim hardship because those parcels fail to conform with the requirements of the Zoning Code.

Applicant responds first that the Board did not solely rely on economic factors in finding an unnecessary hardship exists. Rather, in accordance with the dictates of the Zoning Code, the Board considered the economic detriment to applicant *and* the characteristics of the surrounding neighborhood in concluding the

16

hardship criterion was satisfied here. Second, Applicant maintains that Objectors' reliance on *Volpe* and *Carman* is misplaced. Applicant notes that in both those cases, the property owners subdivided large, conforming parcels into a number of smaller conforming parcels, leaving singular remainder parcels that could not be developed due to their nonconforming lot sizes. *After* such subdivisions, the property owners requested variances related to the remainder lots to cure the self-inflicted hardship created by their own subdivision planning. By contrast here, Applicant seeks variance relief before any subdivision or development proceeds, based on the fact that the existing configuration of the large lots are disproportionate to those in the surrounding area and that by-right development would be out of character with the existing neighborhood. Accordingly, Applicant submits that there is no legal ground that prevents the Board from finding unnecessary hardship here, and its hardship is not *per se* self-inflicted.

We agree with Applicant on both points. First, as to its conclusion that Applicant established an unnecessary hardship, the Board relied heavily on the fact that building by-right would create lots that are inconsistent with the surrounding community. *See* Board Decision, Conclusions of Law Nos. 11-14. Contrary to Objectors' assertion, as the trial court also clearly pointed out, economic detriment was not the sole factor considered by the Board in concluding a hardship was established. Second, we agree with Applicant that Objectors overread *Volpe* and *Carman*. Neither case stands for the broad proposition that subdividing conforming parcels into nonconforming parcels constitutes *per se* self-inflicted harm and therefore neither case bars variance relief as a matter of law here. That proposition would, in instances such as this, all but write out the concept of a dimensional variance from the Zoning Code. Because dimensional variance cases are highly fact

17

specific, we turn to Objector's second contention, to determine whether the Board's conclusion that Applicant established an unnecessary hardship is grounded in substantial evidence of record.

On that point, Objectors assert that the Board mischaracterized Mr. Bomar's testimony from the initial hearing. They maintain that Mr. Bomar testified that there was no financial barrier to reducing the unit count to six conforming parcels, and his testimony merely reflected his opinion that the creation of six larger lots would be out of character with the surrounding neighborhood. *See* Objectors' Br. at 48 (citing R.R. 69a). Objectors maintain that the Board abused its discretion by ignoring this initial hearing testimony. Alternatively, Objectors argue that Mr. Bomar's testimony at the second hearing lacked the required specificity to constitute substantial evidence. They highlight Applicant's failure to provide any financial data related to the price paid for the three original parcels versus the cost of construction.

Applicant responds that the Board accepted and credited its evidence which firmly establishes that the characteristics of three existing large parcels present a unique and unnecessary hardship. Specifically, Applicant argues it carried its burden of production and persuasion to establish that building by-right would not only result in economic detriment to Applicant but would be wholly out of character with the characteristics of the surrounding community. Applicant points to (1) the established fact that average lot sizes for lots immediately surrounding the area were significantly lower than the required 1,440[-]square[-]foot threshold; (2) Mr. Fecteau's, testimony that the average lot size on the 100 Block of Pleasant Street was approximately 1,000 square feet; and (3) the testimony establishing that Applicant's proposed lot sizes all exceed that average. Moreover, the Board found

18

credible and persuasive Mr. Bomar's testimony that building fewer homes by-right would make the project financially unworkable, as larger homes would not fit the area's price point and would be difficult to market and sell. Based on this cumulative evidence, Applicant submits the Board was within its discretion to determine the parcels were subject to a hardship warranting the grant of a dimensional variance.

Our Supreme Court has announced that a zoning board's findings are entitled to deference, particularly a board's determination that a variance applicant satisfied the unnecessary hardship criterion. *Marshall v. City of Phila*, 97 A.3d 323, 333 (Pa. 2014). This deference is due, in part, to the local zoning board's "expertise in and knowledge of local conditions." *Id.* Accordingly, an "appellate court errs when it substitutes its judgment on the merits for that of a zoning board." *Id.* at 331. Mindful of our appellate review, we cannot say that the Board erred in concluding that Applicant proved the unnecessary hardship criterion. First, Objectors, not the Board, mischaracterize Mr. Bomar's testimony in the initial hearing. Contrary to their contention, Mr. Bomar testified that by-right construction would not make sense "from a design point of view *or an economic point of view*." R.R. 69a (emphasis added). Following our fulsome review of the record, we conclude that Applicant provided considerable testimonial evidence that building by-right would be out of character for the neighborhood and would not be financially viable for Applicant. The Zoning Code directs consideration of both of these factors in determining whether an applicant has established unnecessary hardship for a dimensional variance under the Zoning Code. *See* Zoning Code § 14-303(8)(e)(.3). Accordingly, we reject Objectors' argument as to unnecessary hardship.

19

## II. Public Impact

Objectors next assert that the Board wrongly concluded that granting dimensional variances will not adversely impact the public. They argue specifically that the Board's Conclusions of Law Nos. 22 and 23 are not grounded in substantial evidence and improperly shift the burden of proof to the community to demonstrate a negative impact. Objectors also maintain that Conclusion of Law No. 23 is at odds with Finding of Fact No. 30.

The Board's Conclusions of Law Nos. 22 and 23 provide:

22. While there was testimony from the public about possible light and air obstruction of the three windows on the side of the structure on 102 Meehan, no one appeared at the hearing in connection with the property to express these concerns. In fact, Mr. O'Day stated that there had been a structure previously on 106 Meehan, though it had been positioned differently on the lot. [10/21/20 N.T.] at 40.

23. Finally, the Board noted that while Mr. Richardson and Ms. Curlett spoke of the significant and unanimous opposition to the project by near neighbors, only two near neighbors (both from Meehan Street) appeared at either hearing to testify. One neighbor, Ms. Oh, admitted that she currently used 106 Meehan for gardening and community events and had offered to purchase it from the Applicant. Aside from the petition from the Meehan Street residents and the photos submitted by Ms. Oh, the Board also did not receive any written feedback from near neighbors regarding their position on the proposed development during the approximately eighteen months that this matter was before the Board. 4/13/22 N.T. at 24, 25.

Board's Decision at 17, Conclusions of Law Nos. 22-23. The Board's Finding of Fact No. 30 provides:

20

30. After the October 21, 2020, hearing, the Board received a petition from approximately 28 residents on two blocks of Meehan Avenue. The petition read: We the residents of Meehan Avenue are in agreement that we would like to see one house built on Meehan Avenue with a yard. We are also in agreement that we do not want a driveway at all on Meehan Avenue. The neighbors on Meehan Avenue are in agreement with whatever the Pleasant Street residents decide with the exception of a driveway access on Meehan Avenue for the newly built development on Pleasant Street. We would also like to see at least 10 percent of the work force [sic] come from the neighborhood. Pleasant/Meehan Project Petition, November 2020.

*Id.* at 7, Finding of Fact No. 30.

We disagree that the Board improperly shifted the burden of proof to Objectors to show adverse impact to the public. Notably, the Board's Conclusions of Law regarding impact to the public span from Nos. 19 through 23 and generally set forth the concerns voiced by the public and Applicant's response thereto. While Objectors may disagree with the Board's ultimate conclusion that the development will not negatively impact the public, we conclude that Conclusions of Law Nos. 22 and 23 are supported by substantial evidence of record. Specifically, Conclusion of Law No. 22 recounts Mr. O'Day's testimony at the initial hearing where he voiced his concern that the development may result in light and air obstruction to windows of the historic parcel. However, those same concerns were not voiced at the second hearing following Applicant's substantial revisions to the plan. Moreover, we disagree that Conclusion of Law No. 23 is inconsistent with Finding of Fact No. 30. The Board's factual finding describes near neighbor objections to the initial plan, while Conclusion of Law No. 23 explains that there was no evidence of unanimous opposition entered into the record following Applicant's revisions. We reiterate that

21

the Board, as factfinder, is the sole judge of credibility of witnesses and determines the weight afforded thereto. *Pohlig Builders, LLC v. Zoning Hearing Bd. of Schuylkill Twp.*, 25 A.3d 1260, 1266 (Pa. Cmwlth. 2011). The Board's conclusions that the dimensional variances will not adversely impact the public fully consider the testimony presented before the Board at both hearings and are supported by substantial evidence of record.

### III. Minimum Variance

Last, Objectors assert that the Board erred in concluding that Applicant established the requested dimensional variances are the least necessary to afford relief as required by Section 14-303(8)(e)(.1)(.b) of the Zoning Code. They maintain that Mr. Bomar's testimony alone cannot constitute substantial evidence that eight nonconforming lots represents the minimum variance necessary to overcome any unnecessary hardship. Objectors argue that Mr. Bomar's testimony lacked evidence of costs, and Applicant never offered any documentary evidence of cost data or figures to explain why the variances requested constitute the least modification. Without this critical evidence, they maintain that the Board erred in concluding that the minimum variance criterion was satisfied.

Applicant responds that Mr. Bomar's testimony was adequate to carry its burden of proof. It asserts that Mr. Bomar credibly explained that due to the historical designation of 121 Pleasant Street, and the increased costs associated with the required preservation and rehabilitation of that structure, the project would not be financially viable with any less than the proposed eight new construction units. Applicant's Br. (citing R.R. 97a-98a).

This Court's decision in *In re: Appeal of Ridge Park Civic Association*, 240 A.3d 1029 (Pa. Cmwlth. 2020) (*Ridge Park I*), is instructive. In *Ridge Park I*,

developer sought use and dimensional variances for the construction of nine single-family townhomes. The zoning board approved developer's application, and in so doing concluded that the request constituted the minimum variance necessary to afford relief. In support of that conclusion, the zoning board focused on what this Court coined as "qualitative factors," which included testimony from developer's engineer that it would be most cost effective to build the townhomes without the Zoning Code's required setback, and that the developer worked with the Planning Commission to propose only a minor variance for the maximum curb cut. While finding these qualitative factors relevant to the inquiry, this Court ultimately remanded the matter to the trial court to make appropriate findings as to the "quantitative aspects of the minimum variances necessary for [developer's] project to be viable." *Id.* at 1038. This Court explained that "in addition to the pertinent qualitative factors, the necessary departure from the measurable requirements must also be established." *Id.* While observing that it did not seem unlikely that nine units would be the minimum number of units necessary to afford relief, without more precise quantitative evidence, this Court could not "substitute our guess as to what is likely for actual proof." *Id.*

As in *Ridge Park I*, the record in this case lacks quantitative evidence that Applicant's requested dimensional variances are the minimum variances required. Here, the Board based its conclusion on Mr. Bomar's testimony that the project would not be financially viable without eight units, and the testimony and evidence that established the proposed lot sizes and lot widths were consistent with the surrounding area. While both of these qualitative factors are relevant, there is an absence of any quantitative proof that eight units, in the sizes and widths proposed, is the minimum variance required to make the project viable and "we cannot

substitute our guess as to what is likely for actual proof." *Ridge Park I* , 240 A.3d at 1038.

Accordingly, we must remand to the trial court to make appropriate findings as to the quantitative aspects of the minimum variances necessary for this to be a viable project. *See Ridge Park I*; *see also In re Ridge Park Civic Association* (Pa. Cmwlth., No. 1159 C.D. 2020, filed Feb. 24, 2022), 2022 WL 552594 (*Ridge Park II*) (remanding, yet again, "for more precise proof on [the] quantitative issue").

In sum, we affirm the trial court's order to the extent it concluded that Applicant established unnecessary hardship and that the grant of a dimensional variance will not adversely impact the public. We vacate the trial court's order to the extent it concluded Applicant established the minimum variance requirement, and remand for further proceedings consistent with the foregoing opinion.

 

 

_____
MATTHEW S. WOLF, Judge

24

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Appeal of: East Mount Airy Neighbors :
and Susan Oh :
 : No. 620 C.D. 2023
From a Decision of: Zoning Board of :
Adjustment :

## **O R D E R**

   AND NOW, this 16th day of September 2025, the May 8, 2023 order of the Court of Common Pleas of Philadelphia County is AFFIRMED, in part, and VACATED and REMANDED, in part, for further proceedings in accordance with the foregoing opinion.

   Jurisdiction is relinquished.

        _____
        MATTHEW S. WOLF, Judge